**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DESMOND KEITH CARTER,
      *Petitioner-Appellant,*

v.

R. C. LEE, Warden, Central Prison,
Raleigh, North Carolina,
      *Respondent-Appellee.*

No. 01-19

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
Frank W. Bullock, Jr., District Judge.
(CA-99-411-1)

Argued: January 24, 2002

Decided: March 11, 2002

Before MOTZ, KING, and GREGORY, Circuit Judges.

Certificate of appealability denied and appeal dismissed by published opinion. Judge King wrote the opinion, in which Judge Motz and Judge Gregory joined.

## COUNSEL

**ARGUED:** William Lindsay Osteen, Jr., ADAMS & OSTEEN, Greensboro, North Carolina, for Appellant. Gerald Patrick Murphy, Special Deputy Attorney General, NORTH CAROLINA DEPART-MENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Walter Lamar Jones, CLIFFORD, CLENDENIN, O'HALE,

JONES, L.L.P., Greensboro, North Carolina, for Appellant. Roy Cooper, Attorney General of North Carolina, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

---

**OPINION**

KING, Circuit Judge:

In 1993, Desmond Keith Carter was convicted by a state court jury in Rockingham County, North Carolina, of the separate crimes of capital murder and robbery with a dangerous weapon. The jury recommended that Carter be sentenced to death on the murder offense, and the judge imposed the death penalty, plus a consecutive term of forty years' imprisonment for the robbery. After an unavailing direct appeal process, Carter unsuccessfully sought post-conviction relief in North Carolina. Carter then petitioned for federal habeas corpus relief in the Middle District of North Carolina. He now appeals the district court's denial of his habeas corpus petition, contending that the advice of his two court-appointed attorneys constituted ineffective assistance of counsel. As we explain below, Carter's Sixth Amendment claim of ineffective assistance is without merit. We accordingly decline to issue a certificate of appealability, and we dismiss his appeal.

I.

Carter was indicted on April 6, 1992, by a Rockingham County grand jury, for the stabbing death of his next-door neighbor, seventy-one-year-old Helen Purdy. He was again indicted, on February 1, 1993, for the robbery of Mrs. Purdy with a dangerous weapon. These crimes occurred during the same episode on March 9, 1992. By Carter's admissions, he went to Mrs. Purdy's home in the early morning hours of that day, carrying a butcher knife and seeking to borrow money to purchase cocaine. Although Mrs. Purdy initially agreed to lend Carter money, she then changed her mind and refused to do so. Carter maintained that when Mrs. Purdy saw the butcher knife, she "became excited," attempted to push him, and then fell into the knife. Mrs. Purdy died soon thereafter from thirteen stab wounds.

## A.

Carter was tried and convicted in the Superior Court of Rockingham County for the first-degree murder of Mrs. Purdy, based on two theories: (1) premeditation and deliberation, and (2) felony murder. He was also convicted on the related charge of robbery with a dangerous weapon. After the statutorily mandated sentencing proceeding, the jury unanimously recommended that Carter be sentenced to the death penalty, which the judge imposed.[1] Carter was also sentenced to a consecutive forty-year prison term for the robbery.

Carter initially appealed to the Supreme Court of North Carolina, which, on December 8, 1995, affirmed his convictions and sentences.[2] *State v. Carter*, 464 S.E.2d 272 (N.C. 1995). On May 28, 1996, the Supreme Court of the United States denied Carter's request for certiorari. *Carter v. North Carolina*, 517 U.S. 1225 (1996). Having exhausted his avenues of direct appeal, Carter thereafter, on April 29, 1997, filed his Motion for Appropriate Relief (the "MAR"), seeking post-conviction relief in the Superior Court of Rockingham County (the "PCR Court"), and asserting five separate claims of error.[3]

In its handling of Carter's MAR, the PCR Court initially ruled on four of his five MAR claims without conducting an evidentiary hearing. *State v. Carter*, Order Denying Claims II, III, IV and V of Defendant's Motion for Appropriate Relief on the Pleadings, 92 CRS 2162, 93 CRS 1039 (N.C. Super. Ct. Dec. 8, 1997) ("MAR Order I").[4] After

---

[1]In a capital case in North Carolina, the Superior Court jury hears evidence in the sentencing phase of trial and then makes a binding sentencing recommendation to the judge. N.C. Gen. Stat. § 15A-2000(b); *see* *State v. McCollum*, 433 S.E.2d 144, 153 (N.C. 1993).

[2]Carter's direct appeal bypassed the North Carolina Court of Appeals. *See* N.C. Gen. Stat. § 7A-27(a).

[3]A defendant convicted of a capital crime in North Carolina may seek post-conviction relief by way of an MAR. An MAR is not exactly the same as a habeas corpus petition but, in North Carolina, any attempt to obtain relief from "errors committed in criminal trials" may be made by MAR. *See* N.C. Gen. Stat. § 15A-1401.

[4]The four claims disposed of by the PCR Court in MAR Order I were: (1) denial of a fair trial due to failure to refrigerate a blood sample taken

conducting an evidentiary hearing on the MAR's remaining claim —
whether counsel's advice to Carter that he should testify in his own
defense during the guilt phase of his trial was constitutionally ineffec-
tive ("claim I")— the court also denied relief thereon. *State v. Carter*,
Order Denying Claim I of Motion for Appropriate Relief, 92 CRS
2162, 93 CRS 1039 (N.C. Super. Ct. July 6, 1998) ("MAR Order II").
Carter then sought review in the Supreme Court of North Carolina
from the PCR Court's denial of his MAR. That court, however,
denied his request for certiorari on May 6, 1999, *State v. Carter*, 535
S.E.2d 867 (N.C. 1999), and Carter did not seek certiorari in the
Supreme Court of the United States.[5]

   His post-conviction proceedings in state court having proven futile,
Carter then sought federal habeas corpus relief in the Middle District
of North Carolina. In response, the State moved for summary judg-
ment, and on April 12, 2001, a magistrate judge recommended that
summary judgment be granted. *Carter v. French*, Recommendation of
United States Magistrate Judge, 1:99CV00411 (M.D.N.C. April 12,
2001). On July 31, 2001, the district court adopted the recommenda-
tion of the magistrate judge, granting summary judgment to the State
and declining to issue Carter a certificate of appealability.[6]    *Carter
v. French*, Order, 1:99CV00411 (M.D.N.C. July 31, 2001). On
August 28, 2001, Carter filed a timely notice of appeal, and he now
seeks issuance of a certificate of appealability and an award of habeas

---

from Carter the morning after the crime (claim II); (2) denial of due pro-
cess because a former District Attorney, when previously in private prac-
tice, had represented Carter on criminal charges (claim III); (3) violation
of due process through an allegedly erroneous jury instruction (claim
IV); and (4) constitutional error in using Carter's prior robbery convic-
tion as an aggravating circumstance because his guilty plea to the earlier
charge had been entered without effective assistance of counsel (claim
V). The PCR Court, as it explained in MAR Order I, found no merit in
any of these four contentions, and Carter has not raised them in this pro-
ceeding.

   [5]The Warden (the "State") does not raise any issue of procedural
default in this proceeding.

   [6]A certificate of appealability may only be issued when "the applicant
has made a substantial showing of the denial of a constitutional right."
28 U.S.C. § 2253(c).

corpus relief. He asserts a single issue: that his trial attorneys' advice that he should testify in his own defense during the guilt phase of his trial was constitutionally ineffective.

B.

In its Opinion of December 8, 1995, rejecting Carter's direct appeal of his convictions and sentences, the Supreme Court of North Carolina summarized the facts underlying his prosecution and the evidence presented during Carter's jury trial in Rockingham County. We are unable to improve on the factual summary in that Opinion, and it is set forth, *in haec verba*, as follows:

> The victim, Helen Purdy, was a seventy-one-year-old resident of Eden, North Carolina. She lived alone beside the home of defendant, his grandmother, and his uncle. Because of her fragile health, friends and family members took turns looking after and checking in on her. On 9 March 1992 Gchuther Morris, Mrs. Purdy's sister-in-law, tried calling Mrs. Purdy all day and became concerned when she did not get an answer. Around 9:15 p.m. Linda Purdy, Shirley Gray, and Ralph Carter went to Mrs. Purdy's house. They found her dead on her living room floor, lying in a pool of blood. Aside from the front door being unlocked, everything in the house generally appeared in order; there was no sign of a struggle. In Mrs. Purdy's bedroom the bed covers were turned back to one side, as if someone had been lying on the bed, and Mrs. Purdy's purse was lying open on the bed.

> Dr. Robert L. Thompson, the forensic pathologist who performed the autopsy, found thirteen cut and stab wounds as well as numerous minor cuts and abrasions to Mrs. Purdy's hands, neck, and face. The significant findings included: (1) two incised or cut wounds in the victim's right chest, both with depths of 4 3/4 inches, one penetrating the pericardium sac and the other the liver; (2) two incised or cut wounds in the left chest with depths of 4 1/2 inches and 6 inches, again penetrating the pericardium sac and liver; (3) two incised or cut wounds in the left armpit with depths of 6 inches and 3 1/2 inches; (4) wounds to the back of the left

arm, two of which went completely through the arm; (5) a small abrasion of the lower lip; (6) a superficial one-inch-long cut in the area of the left ear and a one-half inch cut below the angle of the jaw on the left side; (7) scratches and cuts on both wrists; (8) a 5 1/8 inch cut on the left first finger, described as a defensive wound; and (9) a large incised wound in the left side of the neck measuring 4 inches down to the bone. Dr. Thompson opined that death was caused by the wounds to the chest, none of which would have been instantly fatal. It would have taken several minutes for death to occur.

Nadine Carter, defendant's [i.e., Carter's] grandmother, testified that on the morning of 9 March 1992, defendant had called her into his room and told her he needed to go to the hospital. He said he had been accosted by four young white males at the car wash when he was coming home the night before and had been stabbed in the leg. Defendant had a towel wrapped around his leg. When Mrs. Carter looked at defendant, she knew something was not right, but she believed his story and did not question him further. She then drove defendant to Morehead Hospital.

Mary Hertle, an emergency room employee of Morehead Hospital, was on duty on 9 March 1992. Defendant came to the emergency room around 8:30 a.m. reporting a puncture wound two or three inches deep to the left inner thigh. Defendant said four white men had assaulted him at the car wash the previous night. Although defendant smelled of alcohol and said he did not come earlier because he was too drunk, Ms. Hertle observed that defendant did not appear intoxicated or in pain, his speech was not slurred, and he gave what appeared to be appropriate answers to questions.

Mark Joyce, an Eden police officer, also saw defendant at Morehead Hospital that morning. Defendant told him essentially the same story about his leg wound. In Joyce's opinion, although defendant had been drinking and there was a strong odor of alcohol about him, defendant was not impaired.

Greg Moore, an Eden Police Department detective, was assigned to investigate the murder. He had seen defendant on crutches on 9 March 1992 at the magistrate's office and knew defendant was reporting a knife wound to his leg.

Detective Moore also knew defendant lived beside the victim. At approximately 8:40 a.m. on 10 March 1992, Detective Moore and SBI Agent James Bowman interviewed defendant at the Rockingham County jail. At that time, defendant was incarcerated on another charge for which he had been arrested on 9 March 1992. In substance, defendant initially gave these officers the following version of the events leading to his leg wound. Defendant said three white men had jumped him on Monday, 9 March 1992, about 4:30 or 5:00 a.m. He had been riding around and drinking with his friends, Quentin Broadnax and Jamel Price. After Broadnax dropped him off, defendant walked around before stopping at the corner of Henry and Early Streets. Defendant said he "threw up" at this time. Defendant then sat on the steps at the YMCA for a few hours. He said he may have dozed off.

According to defendant, he had been drinking beer and liquor for most of the day and evening. After leaving the YMCA steps, defendant walked up Monroe Street towards home and was in the car wash parking lot when he saw some people getting into a truck. He could tell they were white males. The truck was directly across the street from Mrs. Purdy's house. He said he tried to cut through the lot to avoid them, but they pulled toward him and began shouting obscenities. When defendant hollered back, the men stopped the truck and began chasing him. Defendant tried to run, but they caught him, and he was too drunk to defend himself. As one man came up on his left side, defendant tried to kick him but got stabbed in the left leg in the process.

In the course of this interview, Detective Moore was advised that defendant had a doctor's appointment at 9:45 a.m. Prior to leaving for the appointment, defendant signed

a consent to have a blood sample drawn. Following the doctor's appointment, Moore and Bowman again interviewed defendant. Prior to commencing the second interview, defendant was told a butcher knife had been found in the lot near his residence. Thereafter, defendant confessed to the officers and gave a new statement. Detective Moore testified that defendant told the officers he went to the home of Helen Purdy in the early morning hours of 9 March 1992. He had been drinking and using cocaine and wanted to borrow money from Mrs. Purdy. Mrs. Purdy let defendant into her home and initially told him he could borrow five dollars. She then changed her mind and said he could not have any money. Mrs. Purdy then went towards the telephone, whereupon defendant asked her not to call his grandmother. Defendant stated that at that point Mrs. Purdy noticed defendant had a knife, and she became excited. She tried to push defendant, and in the process the knife went in her. Defendant pulled the knife out and stuck it in his own leg. Defendant said he did not know what happened after he cut himself and did not know how many times he stabbed Mrs. Purdy. Prior to going home defendant took fifteen dollars that Mrs. Purdy had placed near the telephone and used it to buy cocaine. He then threw the knife into a field next to his house. Agent Bowman testified that blood drawn from defendant the day after the murder was not tested for alcohol or drug content.

The State introduced a knife found across the street from the murder scene. Lieutenant Walter Johnson testified that the knife was found on the grass in plain view and that no effort had been made to hide it. Blood of Mrs. Purdy's type was found on the knife. Mrs. Carter identified the knife as one from her kitchen.

Denise Smith, a girlfriend of defendant's at the time of the murder, testified that in the summer of 1991, she asked defendant if he used cocaine or any other drug. Defendant said "no" but told her that if a person is arrested, he should say he was under the influence of drugs and he would get a lighter sentence. After defendant was arrested for Mrs.

Purdy's murder, Ms. Smith visited defendant in jail. While in the presence of another detainee, defendant commented he had been to a mental health appointment. When the other detainee mimicked *The Twilight Zone* tune, defendant stated, "Man, I'm not crazy."

Defendant also presented evidence. Jamel Price, defendant's friend, testified that he and defendant spent the day together on 8 March 1992. Defendant began drinking at approximately 12:30 p.m. that day. Price and defendant visited various establishments in Reidsville; and Price watched defendant consume more than one hundred ounces of beer, some wine, and some liquor. Price did not see defendant take drugs, but he was not with him all the time.

Another companion, Quentin Broadnax, gave a similar account. On cross-examination Broadnax said that they went to defendant's house before going to Reidsville and that he believed defendant got five dollars from Mrs. Carter.

Defendant testified in his own behalf. He said he spent the day on 8 March drinking beer, wine, and bootleg whiskey. He also consumed a twenty-five dollar bag of powder cocaine, a twenty dollar rock of crack cocaine, and two pills which he identified as "Zannex." During the early morning hours of 9 March, he had wanted to buy cocaine. Although he had fifty or sixty dollars on him, he wanted to borrow more so he could get as much cocaine as possible. Mrs. Purdy's light was on, so he went to her door to ask for money. The remainder of defendant's testimony corresponded with the confession he had given to Detective Moore and Agent Bowman.

Defendant presented other evidence tending to show that he was mentally impaired at the time of the murder and that he had had a tumultuous childhood. Dr. John Warren, a clinical psychologist who examined defendant after his arrest, testified that defendant had a low average IQ and suffered from a borderline personality disorder as well as a substance-abuse problem. He opined that defendant's men-

tal capacity was diminished at the time of the offense, making it very unlikely that he could make and carry out a plan to kill.

During the sentencing phase, the State introduced evidence concerning the facts and circumstances of defendant's prior conviction for second-degree robbery. Darwin Neely, the victim of that robbery, testified that in March 1986 defendant and three other men abducted him, forced him into a car at gunpoint, stole his money and personal items, and temporarily held him hostage. All four men had guns. The State introduced a certified copy of a judgment from Nassau County Court, State of New York, which had been entered upon defendant's plea of guilty to second-degree robbery. Defendant served four years in prison for that offense.

Defendant's penalty-phase evidence tended to show that he was well behaved, kind, and loving. Dr. Warren testified that defendant was under the influence of emotional disturbance at the time of the crime and that his ability to appreciate the criminality of his conduct was impaired. Dr. Warren found that defendant would benefit from a structured environment, had done well in prison before, and did not have disciplinary problems. Lucy Moriello, a counselor with the New York Department of Corrections for eleven years, characterized defendant's time in prison in New York as good conduct, with appropriate behavior and no disciplinary problems.

On rebuttal, the State presented evidence of defendant's insolence while being held pretrial at the Rockingham County jail.

Prior to the presentation of any evidence, counsel for defendant conceded that defendant had stabbed and killed Mrs. Purdy, but contended that it was second-degree murder, not first. The jury found defendant guilty of first-degree murder on the theories of premeditation and deliberation and felony murder. It also found him guilty of robbery with a

dangerous weapon. At the capital sentencing proceeding, the jury found as aggravating circumstances that the crime was committed for pecuniary gain and that defendant had been previously convicted of a felony involving the use or threat of violence. The jury rejected all proposed statutory mitigating circumstances and found three of the eleven nonstatutory mitigating circumstances submitted. It unanimously recommended a sentence of death, which the trial court accordingly imposed.

*State v. Carter*, 464 S.E.2d 272, 275-77 (N.C. 1995).

In addition to the foregoing factual background, certain relevant factual and procedural underpinnings of Carter's claim of ineffective assistance of counsel are spelled out and discussed in our legal analysis of his constitutional contention. *See infra* Part III.A.

## II.

In our consideration of Carter's claim that he was denied his Sixth Amendment right to the effective assistance of counsel, we must employ the deferential standard of review embodied in the Antiterrorism and Effective Death Penalty Act, codified at 28 U.S.C. § 2254 ("AEDPA"). Pursuant thereto, a federal court may not award habeas corpus relief with respect to a claim previously adjudicated on its merits in a state court proceeding unless the state court's adjudication resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) unless the state court's adjudication was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d).

As the Supreme Court recently explained, a state court adjudication is "contrary to" clearly established federal law only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court decision unreasonably applies clearly established federal

law if it "unreasonably applies that principle to the facts of the prisoner's case." *Id.* Significantly, findings of fact by a state court are entitled to a "presumption of correctness" that a petitioner, such as Carter, must rebut by clear and convincing evidence. *See* § 2254(e)(1).

Carter's contention that he was denied the effective assistance of counsel is one that is governed by clearly established federal law — specifically by the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prevail on an ineffective assistance claim under *Strickland*, a petitioner must satisfy a two-pronged test. First of all, the petitioner must demonstrate "that counsel's performance was deficient," meaning "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Second, he must show "that the deficient performance prejudiced the defense," i.e., that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

In considering a Sixth Amendment ineffectiveness claim, a reviewing court does not "grade" the lawyer's trial performance; it examines only whether his conduct was reasonable "under prevailing professional norms," and in light of the circumstances. *Id.* at 697, 688. Because it may be tempting to find an unsuccessful trial strategy to be unreasonable, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. And as our Judge Murnaghan rightly recognized several years ago, the advice provided by a criminal defense lawyer on whether his client should testify is "a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance." *Hutchins v. Garrison*, 724 F.2d 1425, 1436 (4th Cir. 1983), *cert. denied*, 464 U.S. 1065 (1984); *see also Jones v. Murray*, 947 F.2d 1106, 1116 n.6 (4th Cir. 1991) (reiterating principle that advice to testify is paradigmatic of strategic decision); *Rogers-Bey v. Lane*, 896 F.2d 279, 283 (7th Cir. 1990) (concluding that counsel's advice not to testify, based in part on erroneous belief that defendant could be impeached by prior conviction, was not deficient performance); *Reyes-Vejerano v. United States*, 117 F. Supp. 2d 103, 108-09 (D.P.R. 2000) ("Absent evidence of coer-

cion, legal advice concerning the defendant's right to testify does not constitute [ineffective assistance of counsel].").

With these controlling legal principles in mind, we turn to the sole issue raised by Carter in this habeas corpus proceeding, i.e., his claim that he was denied his Sixth Amendment right to the effective assistance of counsel in his 1993 state court trial in North Carolina.

III.

Carter makes two separate contentions in support of his claim that his lawyers' advice was constitutionally defective. First, he maintains that his court-appointed lawyers failed to apprise him of the disadvantages of testifying in his own defense. Second, Carter maintains that his lawyers offered erroneous advice that forced him to testify in contravention of his right against self-incrimination. In addressing these separate aspects of his Sixth Amendment claim, we will first review the relevant underpinnings of that claim. We will then assess whether the performance of Carter's lawyers was constitutionally deficient.

A.

As we discussed earlier, the PCR Court conducted a full evidentiary hearing on Carter's MAR claim I, i.e., that erroneous advice provided by his trial attorneys constituted ineffective assistance of counsel.[7] During this evidentiary hearing, evidence was adduced regarding Carter's trial representation, including the testimony of his two defense lawyers, Thomas E. Medlin, Jr. and Douglas R. Hux. Medlin and Hux each possessed experience in the defense of capital murder cases in North Carolina. Hux had practiced law for approximately twenty-two years, and Medlin had been in practice for nearly ten years. After considering the evidence, the PCR Court found, inter alia, that both attor-

---

[7]With regard to the ineffective assistance claim, the PCR Court concluded that it could not "rule upon the motion without the hearing of evidence," and it was required to "conduct a hearing for the taking of evidence, and [to] make findings of fact." *See* N.C. Gen. Stat. Ann. § 15A-1420(c)(4). The PCR Court determined, pursuant to N.C. Gen. Stat. Ann. § 15A-1419 and 1420, that an evidentiary hearing was unnecessary to the resolution of MAR claims II through V.

neys had met and consulted with Carter on numerous occasions, and that they had researched and investigated the possibility of a diminished capacity defense. They each advised Carter that his best possible defense (and, as Carter conceded in his MAR, his only defense) was diminished mental capacity. MAR Order II at 5. This diminished capacity defense was premised in part on Carter's consumption of "alcohol, cocaine and other impairing substances . . . prior to going to the home of the victim." *Id.* Medlin had also "consulted with the Death Penalty Resource Center and learned attorneys with that agency agreed with this strategy." *Id.* To assist them in developing Carter's diminished capacity defense, the lawyers had hired a licensed psychologist, Dr. John Warren, to evaluate Carter's mental status.

The PCR Court found that Medlin had "determined that a diminished capacity defense would apply to both the first-degree murder charge and the robbery charge since both are specific intent offenses." *Id.* at 6. According to the PCR Court, Medlin knew that, as a practical matter, he could present the diminished capacity defense through Dr. Warren's testimony, without putting Carter on the witness stand. *Id.* at 7. Nonetheless, after careful consideration of the advantages and disadvantages of such a course of action, Medlin advised Carter that he should testify in his own defense during the trial's guilt phase.

In making the decision to render this advice, Medlin had weighed the already unsuccessful efforts the lawyers had made to suppress Carter's various conflicting statements, and he had also assessed the fact that Carter's admissions to the authorities would be utilized by the State in its case-in-chief. In addition, both lawyers realized that Carter's contradictory admissions and claims concerning his actions in connection with the death of Mrs. Purdy created serious credibility problems. They also realized that these problems had to be favorably resolved in order for Carter's diminished capacity defense to succeed. Medlin had concluded that the defense's utilization of Dr. Warren to testify to the substances Carter had consumed would, standing alone, carry less weight with the jury than Carter's own testimony. Indeed, Medlin believed that "Carter could and needed to explain the contradictions in his statements to the jury in order to repair his credibility and to put him in a position to lay a credible foundation for the amount of impairing substances he consumed the night of the mur-

der." *Id.* Significantly, the PCR Court, in its consideration of the lawyers' advice that Carter should testify, found that:

> This was a strategic decision Medlin and Hux made and they consulted with Carter on the issue and gave him their best advice on the issue. In the course of representing Carter, Medlin and Hux determined he was likeable and easy to talk to and they felt he would come across that way to the jury if he did well on the stand. This would also be a way to humanize Carter in the eyes of the jury.

*Id.* at 7-8.

### B.

### 1.

In the first of the two aspects of Carter's ineffective assistance contention, he maintains that his lawyers failed to consult with him on both the advantages and disadvantages of his testifying in his own defense. This contention is without legal merit, however, for a very simple reason: the PCR Court explicitly found otherwise in its MAR Order II. The PCR Court, after conducting its thorough evidentiary hearing on MAR claim I, found that "the relevant advantages and disadvantages" of testifying were in fact discussed with Carter, as was the defense strategy of pursuing a diminished capacity defense.[8] MAR Order II at 9.

Under the deferential standard of review established by AEDPA and embodied in § 2254(e)(1), Carter must, in order to overcome this

---

[8]In denying Carter's ineffective assistance claim, the PCR Court found the following:

> 18. Medlin, Hux and Carter discussed the relevant advantages and disadvantages of the defendant testifying and counsel's strategy to pursue a diminished capacity defense. Carter never objected to the strategy to pursue a diminished capacity defense or for him to testify in support thereof at trial. . . .

MAR Order II at 9.

adverse finding of fact, establish by clear and convincing evidence that it is erroneous. And, simply put, he is unable to do so. Hux testified that Carter was specifically advised by his lawyers that he would be impeached at trial with the contradictory statements he had earlier made to the authorities. Transcript of MAR Claim I Hearing at 78, *State v. Carter*, (N.C. Super. Ct. Dec. 15, 1997) (No. 92 CRS 2162, 93 CRS 1039) ("MAR Tr."). And although Hux did not recall a specific occasion, he was "sure" that the lawyers had discussed with Carter various potential areas of the prosecutor's cross-examination, such as conflicts between Carter's prospective trial testimony and the testimony of various State witnesses. *Id.* at 80. Hux had also advised Carter that he was likely to be cross-examined about his prior drug activities. *Id.* at 84. And not only did Carter's counsel advise him that he could be impeached at trial, they actually impeached him in a mock cross-examination. Indeed, in preparing Carter to testify, Medlin and Hux videotaped Carter's mock cross-examination, and they then reviewed and critiqued it for him. MAR Order II at 10.

Medlin had also advised and consulted with Carter concerning, among other matters, the inconsistencies between his various statements to the police, his prior criminal record, and how these problems would impact on his credibility before the jury. MAR Tr. at 183. Medlin's philosophy, of which he advised Carter, was "that the jury was going to hear these things; if they hear it from him it'll be better than if they don't." *Id.* Medlin also advised Carter "in a general way" that the jury might not believe him. *Id.* at 185. Medlin had also reviewed with Carter the pros and cons of his testifying in the trial's guilt phase, as opposed to its penalty phase, and he had advised Carter that, in his opinion, "as far as what we were trying to accomplish," i.e., establish the diminished capacity defense, he should testify in the trial's guilt phase. *Id.* at 191. Indeed, Carter concedes that he was properly advised by his lawyers that the decision on whether he should testify during the guilt phase of his trial was his alone.

Significantly, the PCR Court found, in MAR Order II, that the disadvantages of testifying had been specifically discussed with Carter prior to his decision to take the witness stand, and it also found that Carter had failed to demonstrate that his decision to testify was not fully informed. MAR Order II at 9, 13. These findings are amply supported by the evidence, and Carter is unable to demonstrate by clear

and convincing evidence, as he must, that the PCR Court's findings are erroneous.[9]

Because Carter was properly advised of his right not to testify in his own defense, his lawyers were not constitutionally deficient in recommending that he testify, and in advising him that his testimony was necessary for success of the diminished capacity defense. *See United States v. Teague*, 953 F.2d 1525, 1533 (11th Cir. 1992) (observing that when counsel has formed an opinion whether his client should testify, he should advise his client "in the strongest possible terms"). In fact, the advice of Carter's lawyers that he testify in his trial's guilt phase was a sound strategy and, on this record, their performance was far from deficient. As such, the PCR Court's finding — that the advice of Carter's lawyers that he testify in the guilt phase of his trial was within the bounds of reasonable professional assistance — does not constitute an unreasonable application of clearly established federal law.[10]

---

[9]Carter also maintains that his lawyers' advice that he should testify was unreasonable, given the conflicts they knew to exist between his testimony and other evidence in the case. Carter's reliance on *Johnson v. Baldwin*, 114 F.3d 835 (9th Cir. 1997), is misplaced, however. Unlike in *Baldwin*, the case against Carter was overwhelming, and his lawyers had conducted an adequate investigation. And unlike in *Baldwin*, there was no allegation or showing that Carter was perjuring himself. To the extent Carter claimed lack of memory of certain details, his defense rested, in part, on his inability to accurately recall the events surrounding Mrs. Purdy's death. MAR Order II at 8.

[10]Carter further contends that the failure of his lawyers to consult with him on the disadvantages of testifying entitles him to a new sentencing hearing. In order to obtain such relief, Carter "must affirmatively show" that, if he had not testified, there is a reasonable probability the jury would not have imposed the death penalty. *Jones v. Murray*, 947 F.2d 1106, 1115 (4th Cir. 1991). Carter is unable to show that, absent his testimony, the jury would have recommended a different sentence. As such, the PCR Court did not unreasonably apply *Strickland* in rejecting this contention.

2.

Carter also maintains that his lawyers' advice that he should testify in his own defense was legally erroneous, and that it in essence forced him to testify against his will. As we have observed, a criminal defendant's contention that his counsel forced him to testify is also analyzed under the principles of *Strickland v. Washington. See Sexton v. French*, 163 F.3d 874, 882 (4th Cir. 1998).[11] We therefore look to the first prong of the *Strickland* analysis, and we must assess whether the performance of Carter's lawyers fell outside the wide range of reasonable professional assistance.

Carter's contention is based on an asserted mistaken belief on the part of Hux that Carter *had* to testify in order to establish the foundation for a diminished capacity defense. It is clear, however, that Medlin fully understood that Carter's testimony was not *legally* necessary to the presentation of such a defense to the jury. Medlin simply believed that, as a practical matter, Carter's testimony in the trial's guilt phase was necessary to any realistic chance of a *successful* diminished capacity defense. Carter contends, nonetheless, that neither of his lawyers informed him that his testimony was not *legally* necessary, and that their advice that he testify was therefore constitutionally defective. In substance, Carter asks us to conclude that, if he had been advised that it was not legally necessary for him to testify, but that his testimony was only necessary, from a practical standpoint, to any realistic chance of a successful defense, he would have decided against taking the witness stand.

Carter's contention in this regard must also fail. Simply put, the

---

[11]In his Reply Brief, Carter makes the related claim that his decision to testify was "involuntary." In this connection, we observe that this Court normally views contentions not raised in an opening brief to be waived. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999). However, even if not waived, this contention is without merit. Although Carter's lawyers advised him that he "needed" to testify, and they strongly advised him of the necessity of his testimony to any potentially successful defense, they did not require or force him to take the witness stand. *See Hutchins v. Garrison*, 724 F.2d 1425 (4th Cir. 1983). Accordingly, Carter's tardy assertion of coercion would fail on its merits.

PCR Court found that Carter *was* properly advised that the decision of whether he should testify in the trial's guilt phase was his and his alone.[12] When Carter was advised of the defense strategy, of which his testimony during the guilt phase was an essential part, he was fully aware of the fact that he was not required to testify, and he did not disagree with the defense strategy devised by his lawyers. Although he expressed some reservations about being cross-examined, Carter readily agreed to the defense strategy when Hux and Medlin reassured him that he could be an effective witness, and that testifying was the best strategy for his defense. As Judge Murnaghan observed in *Hutchins v. Garrison*, such advice by a defense lawyer to his client is the very "type of tactical decision that cannot be challenged as evidence of ineffective assistance." 724 F.2d 1425, 1436 (4th Cir. 1983). Indeed, in Carter's own affidavit, submitted to the PCR Court, he swore that he had "no strong feelings" about whether to testify; thus, he had taken no stance that his lawyers forced him to abandon. As such, the trial performance of Carter's lawyers was not deficient, and the PCR Court did not unreasonably apply the clearly established federal law enunciated by the Court in *Strickland*.[13]

---

[12]The PCR Court made clear that the decision to testify was Carter's alone, and in its findings of fact set forth the following:

> 19. *Medlin and Hux advised Carter the decision to testify was his and his alone to make.* Based on the factors noted above — credibility, humanizing the defendant, and providing a foundation for the diminished capacity defense — they advised him they believed it to be in his best interest to testify. Carter did express concern about how he would do on cross-examination, however, Medlin and Hux advised him they would work with him to prepare him for this issue. Carter never told his attorneys he did not or would not testify. *In an affidavit attached to his MAR, Carter stated he "had no strong feelings either way about testifying[.]"*

MAR Order II at 9 (emphasis added).

[13]If we were to assume that the performance of Carter's lawyers was somehow deficient, his claim of ineffective assistance would nonetheless fail because he is unable to demonstrate the prejudice required by the second prong of the *Strickland* analysis. As the PCR Court observed, Carter's "MAR essentially concedes that he can not establish prejudice in the guilt phase." MAR Order II at 13.

## IV.

For the foregoing reasons, and because Carter has failed to make a substantial showing of the denial of a constitutional right, we must decline to issue a certificate of appealability and dismiss Carter's appeal.

*CERTIFICATE OF APPEALABILITY DENIED*
*AND APPEAL DISMISSED*